UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| BELLSOUTH | ) | |
| TELECOMMUNICATIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 08-07-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| KENTUCKY PUBLIC SERVICE | ) | **MEMORANDUM OPINION** |
| COMMISSION, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Bellsouth Telecommunications, Inc., doing business as AT&T Kentucky (AT&T Kentucky), seeks declaratory and injunctive relief from decisions of Defendant Kentucky Public Service Commission (the Commission). SouthEast Telephone, Inc. (SouthEast) and Competitive Carriers of the South, Inc. (CompSouth) intervened as defendants pursuant to Rule 24(b)(2) of the Federal Rules of Civil Procedure and argue in support the Commission's findings. For the reasons discussed below the Court will grant, in part, and deny, in part, the relief sought by AT&T Kentucky and remand the matter to the Commission for further proceedings.

## I.

The legislative and procedural history of this dispute is relevant to this analysis. Although the facts are straightforward, the parties have submitted voluminous briefs and exhibits detailing various provisions of the Telecommunications Act of 1996 (the 1996 Act). These provisions – §§ 251, 252, and 271 – regulate the activities of both incumbent and competitive

local exchange carriers (LECs).  AT&T Kentucky is an incumbent LEC.  SouthEast is a competitive LEC.

Under the 1996 Act, incumbent LECs are required to provide certain services and resources to competitive LECs to promote the over-arching goal of the 1996 Act:  competition within local telecommunications service markets.  *See* 1996 Act prmbl., 110 Stat. 56 ("An Act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies").  In furtherance of this effort, AT&T Kentucky was, until recently, required to provide various network elements, to competitive LECs at a low, regulated rate. 47 U.S.C. § 251 (2000) (the rate is best-known as "TELRIC").  The Supreme Court has described the TELRIC rate as being just above the confiscatory level. *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 489 (2002).  This obligation to provide various network elements, referred to as "unbundling," is embodied in contracts, or "interconnection agreements" between LECs.  Unbundling provisions in these interconnection agreements force incumbent LECs like AT&T Kentucky to "interconnect with and [] rent parts of their networks to new entrants – especially those parts of a local network that it is least economic for a new entrant to duplicate."  *Qwest Corp. v. Pub. Utils. Comm'n of Colorado*, 479 F.3d 1184, 1187 (10th Cir. 2007) (quoting James B. Speta, *Antitrust and Local Competition Under the Telecommunications Act*, 71 ANTITRUST L.J. 99, 102-103 (2003)).

However, the FCC eliminated incumbent LECs' § 251 unbundling obligation for various network elements.[1]  Up until that point, there was substantial overlap between those § 251 network elements for which the FCC required unbundling and those elements listed in § 271 of the 1996 Act.  *Verizon New England, Inc. v. Maine Pub. Util. Comm'n*, 509 F.3d 1, 5 (1st Cir. 2007).  Section 271 requires certain incumbent LECs – former Bell System operating companies ("BOC") – to make specific network elements permanently available to other LECs.  Section 271 requires certain incumbent LECs – former Bell System operating companies – to make specific network elements permanently available to other LECs, in contrast to the incumbent LEC duties under §§ 251 and 252, which fluctuate based on the FCC's unbundling requirements at any given time.  Once the FCC issued the *Triennial Review Remand Order* and incumbent LECs were no longer required to provide certain network elements at the TELRIC rate plan, state commissions and LECs were left in limbo trying to determine the appropriate rate for these now "delisted" network elements.  Many state commissions turned to § 271 for guidance and applied its "just and reasonable" pricing standard, allowing incumbent LECs to charge higher rates than they previously charged.[2]

After the FCC eliminated AT&T Kentucky's unbundling obligations, numerous competitive LECs in Kentucky petitioned the Commission to require AT&T Kentucky to

---

[1]  *In the Matter of Unbundled Access to Network Elements*, *Order on Remand*, 20 F.C.C.R. 2533, 2654-2655, WC Docket No. 04-313, CC Docket No. 01-338, FCC 04-290 (Feb. 4, 2005) [hereafter, the *Triennial Review Remand Order*].

[2]  *See In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Third Report and Order and Fourth Further Notice of Proposed Rulemaking*, 15 F.C.C.R. 3696, 3709, CC Docket No. 96-98, FCC 99-238 (Nov. 5, 1999); 47 U.S.C. §§ 201(b), 202(a).

continue to provide unbundled network elements until they could renegotiate their interconnection agreements. The Commission granted the requested relief, prompting AT&T Kentucky to file a complaint with this Court. In a series of decisions issued by Judge Joseph M. Hood, the Commission was enjoined from forcing AT&T Kentucky to continue to provide unbundled network elements. *See BellSouth Telecomms., Inc. v. Cinergy Comm'ns Co.*, No. 3:05-CV-16-JMH, 2006 WL 695424 (E.D. Ky. Mar. 20, 2006). At that point, most competitive LECs negotiated new agreements with AT&T Kentucky, finally giving up their battle to obtained discounted network elements from the incumbent LEC. SouthEast, however, continued the battle.

SouthEast filed a complaint with the Commission. Once again, the Commission ordered AT&T Kentucky to provide a "delisted" network element to SouthEast and set the rate at one dollar more than the old, low unbundled TELRIC rate plan, relying on § 271 as authority. Judge Karen K. Caldwell enjoined the Commission's actions, explaining that state commissions had no authority to act pursuant to § 271. *BellSouth Telecomm., Inc. v. Kentucky Pub. Serv. Comm'n*, No. 06-65-KKC, 2007 WL 2736544, at *6 (E.D. Ky. Sept. 18, 2007). In fact, almost every federal court to address this issue has found that state commissions have no authority to enforce or set rates under § 271 – it is solely the province of the FCC. *See Southwestern Bell Telephone, L.P. v. Missouri Public Service Comm'n*, 530 F.3d 676 (8th Cir. 2008); *Nuvox Commc'ns, Inc. v. BellSouth Commc'ns, Inc.*, 530 F.3d 1330 (11th Cir. 2008); *Verizon New England, Inc. v. Maine Pub. Utils. Comm'n*, 509 F.3d 1 (1st Cir. 2007); *Qwest Corp. v. Pub. Utils. Comm'n of Colorado*, 479 F.3d 1184 (10th Cir. 2007). Judge Caldwell remanded the

matter to the Commission to determine "the amount of damages, if any, owed" to AT&T Kentucky. *BellSouth Telecomm., Inc. v. Kentucky Pub. Serv. Comm'n*, No. 06-65-KKC, 2007 WL 2736544, at *11 (E.D. Ky. Sept. 18, 2007).

On remand, the Commission refused to calculate damages and this Court once again directed the Commission to calculate the amount due to AT&T Kentucky and reminded the Commission that it has no authority to act pursuant to § 271. *BellSouth Telecomm., Inc. v. Kentucky Pub. Serv. Comm'n*, 613 F. Supp. 2d 903 (E.D. Ky. 2009). This battle has found its way once more to this federal court. AT&T Kentucky has filed this complaint requesting declaratory and injunctive relief from the Commission's decision[3] and the subsequent order denying reconsideration.[4]

## II.

AT&T Kentucky specifically appeals five findings in the *PSC Order*. It appeals the Commission's determinations: (1) that the Commission has the authority based on Kentucky statutory law to regulate the terms and rates of those network elements which were "delisted" by the FCC; (2) that interconnection agreements containing obligations under 47 U.S.C. § 271 must be filed with the Commission pursuant to 47 U.S.C. § 252(e)(1); (3) that AT&T Kentucky must make certain network elements available to competitive LECs on a commingled basis; (4)

---

[3] *See* Order, *Petition of BellSouth Telecommunications, Inc. to Establish Generic Docket to Consider Amendments to Interconnection Agreements Resulting from Changes of Law*, Case No. 2004-00427 (Ky. PSC Dec. 12, 2007) [hereafter, *PSC Order*].

[4] *See* Order, *Petition of BellSouth Telecommunications, Inc. to Establish Generic Docket to Consider Amendments to Interconnection Agreements Resulting from Changes of Law*, Case No. 2004-00427 (Ky. PSC Jan. 18, 2008) [hereafter, *PSC Order Denying Reconsideration*].

that AT&T Kentucky must provide the network element known as a splitter upon request of competitive LECs that are engaged in line-splitting arrangements; and (5) that AT&T Kentucky is obligated to unbundle newly-built fiber loops as to enterprise market consumers. *PSC Order*. Each determination will be addressed in turn.

The Commission's findings of facts are reviewed based on an "arbitrary and capricious" standard, which requires that the decision be upheld if it is the result of a deliberate principled reasoning process and supported by substantial evidence. *Michigan Bell Telephone Co. v. Strand*, 305 F.3d 580, 586-587 (6th Cir. 2002) (*citing Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998)). However, the Commission's interpretation of the 1996 Act will be reviewed *de novo* and not given any deference regarding its interpretation. *See id.* at 586; *Michigan Bell Telephone Co. v. MCI Metro Access Transmission Services, Inc.*, 323 F.3d 348, 354 (6th Cir. 2003).

A.    **The Commission's State Law Authority**

CompSouth requested that the Commission establish rates for those network elements that the FCC "delisted" in the *Triennial Review Remand Order*. *PSC Order* at 10. The Commission found "as a matter of Kentucky statutory law, that AT&T Kentucky must furnish [the "delisted" network elements] . . . at fair, just, and non-discriminatory rates." *Id.* at 10-11. The Commission found that it has the authority to establish the rates requested by CompSouth pursuant to KRS §§ 278.030 and 278.170. *Id.* at 11. AT&T Kentucky does not dispute that Kentucky law provides such authority to the Commission. [Record No. 59, p. 10]. Instead, it

-6-

asserts that the state-law authority claimed by the Commission is contrary to, and thus preempted by, federal law.  *Id*.

The Commission points out that it has relied on state authority to promote competition in the intrastate marketplace for nearly eighty years.  It maintains that its state authority is preserved in 47 U.S.C. § 152(b), which states, in part, "nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to [] charges, classifications, practices, services, facilities, or regulations for or in connection with *intrastate* communication . . ."  47 U.S.C. § 152(b) (2009) (emphasis added).  In support, the Commission further points to 47 U.S.C. § 253(b), which states:

> Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

47 U.S.C. § 253(b) (2009).  The crux of this argument is that the Commission is merely ensuring the continued quality and low cost of local telecommunications services in Kentucky and safeguarding the rights of consumers by requiring AT&T Kentucky to provide the "delisted" network elements at reasonable rates.  Thus, the Commission claims it is regulating under its long-standing authority pursuant to Kentucky statutory law.

As the Supreme Court has declared, a state law may not be enforced if it conflicts with federal law.  *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 619 (6th Cir. 2009) (*citing Riley v. Kennedy*, --- U.S. ---, 128 S. Ct. 1970, 1986 (2008) and U.S. Const. art. VI, cl. 2)) (per curiam).  Preemption can be expressed or implied.  *American Council of Life Insurers v. Ross*,

558 F.3d 600, 604 (6th Cir. 2009) (citing *Fidelity Federal Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152 (1982)). The Commission argues that the 1996 Act does not explicitly declare preemption. However, AT&T Kentucky asserts that this is a matter of conflict preemption – a form of implied preemption. *See Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 884 (2000). Conflict preemption "occurs either where it is impossible to comply with both federal and state law, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as reflected in the language, structure and underlying goals of the federal statute at issue." *In re Reinhardt*, 563 F.3d 558, 564 (6th Cir. 2009) (quoting *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562-63 (6th Cir. 1998)). Preemption fundamentally is a question of congressional intent. *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 884 (2000) (*citing English v. General Elec. Co.*, 496 U.S. 72, 78 (1990)).

All parties agree that the Commission is asserting state-law authority to regulate precisely those network elements that the FCC declared not to regulate under 47 U.S.C. § 251 in the *Triennial Review Remand Order*. Since the facts are not at issue, this Court reviews the Commission's interpretation of the 1996 Act *de novo*. This issue turns on whether the intent of the *Triennial Review Remand Order* was to have the "delisted" network elements not regulated at all or just not regulated by the FCC. CompSouth and the Commission correctly note that there is a presumption against the preemption of state regulations and any preemption analysis must be based on the structure and purpose of the statute as a whole. *Lohr v. Medtronic*, 518 U.S. 470, 485-486 (1996). In deciding to eliminate the incumbent LECs' § 251 unbundling obligation

-8-

for various network elements, the *Triennial Review Remand Order* found that requiring incumbent LECs to share certain network elements at the low unbundled TELRIC rate discouraged investment in infrastructure by competitive LECs. *Triennial Review Remand Order*, at 2653-2654. Thus, it is clear that the FCC does not want incumbent LECs to be subject to this obligation. Requiring this obligation under state law is in direct conflict with this goal.

In *Illinois Bell Telephone Co., Inc. v. Box*, the Seventh Circuit dealt with a similar issue and comprehensively explained the purpose of the statute:

> The FCC has been charged by Congress with determining the optimal amount of unbundling-enough to enable [competitive LECs] to compete with [incumbent LECs] but not so much as to enable them to take an almost free ride on services that [the incumbent LEC] has spent a lot of money to create. That judgment, which is certainly within the power of the federal government to make, is without force if a state can require more unbundling . . . than the FCC requires . . . Remember that the [1996] Act seeks to create a competitive telecommunications industry, in which carriers that compete with incumbent local exchange carriers are allowed to demand access at a price below the market price to those carriers' facilities only to the extent necessary to prevent those carriers from using their facilities to throttle their competitors. So it is only bottleneck facilities that competitors can demand access to-the facilities they need to provide a network service.

*Illinois Bell Telephone Co., Inc. v. Box*, 548 F.3d 607, 611-612 (7th Cir. 2008). The Commission is attempting to use its authority under the state statutes to overrule the FCC's decision not to require unbundling for various "delisted" network elements. This is contrary to the FCC's interpretation and application of federal law.

The Commission contends that it is not acting contrary to federal law, as was the state commission in *Illinois Bell Telephone Co., Inc. v. Box*, because it only required that the elements be provided at "fair, just, and non-discriminatory rates." The Commission asserts that the FCC's

decision was to have the "delisted" network elements no longer provided at the low TELRIC rate, not to remove the Commission's authority to require that incumbent LECs' share these network elements. However, this assertion is simple incorrect. The *Triennial Review Remand Order* did not alter the rate structure for certain network elements from the TELRIC rate to "fair, just, and non-discriminatory rate." The *Triennial Review Remand Order* does not state that "fair, just, and non-discriminatory rates" would promote competition and encourage rapid deployment of new telecommunications technologies. The FCC eliminated AT&T Kentucky's unbundling obligations for various network elements to promote innovation and investment in new facilities. *Triennial Review Remand Order.* If AT&T Kentucky wants to provide access to the "delisted" network elements to a competitive LEC, it can do so at a negotiated market price.

By determining that the Commission cannot require additional unbundling, the Commission is not preempted from exercising its role of overseeing the local telecommunications market. The Commission can ensure the quality and low cost of local telecommunications services in Kentucky and safeguard the rights of consumers. However, it cannot act contrary to the FCC's interpretation and application of federal law. Therefore, the Commission's authority based on Kentucky statutory law to regulate the terms and rates of those network elements which were "delisted" by the FCC is preempted.

## B.    Interconnection Agreements Containing § 271 Obligations

The Commission was asked to determine if it has the authority to require AT&T Kentucky to file interconnection agreements that include network elements other than those required to be provided pursuant to 47 U.S.C. § 251. *PSC Order* at 5. The Commission

-10-

determined that obligations pursuant to 47 U.S.C. § 271 are additional interconnection requirements specific to AT&T Kentucky and the interconnection agreements that contain such provisions must be filed with the Commission pursuant to 47 U.S.C. § 252(e)(1). *Id.* AT&T challenges this determination.

AT&T Kentucky argues that the Commission's decision is "contrary to the limits placed on state commissions under the deregulatory federal scheme, and it is unlawful and preempted." [Record No. 59, p. 20]. Under § 271, if AT&T Kentucky wants to offer long-distance service, it must provide competitive LECs with access to certain network elements even though those network elements are no longer required to be provided to the competitive LECs under § 251. *Southwestern Bell Telephone, L.P. v. Missouri Public Service Comm'n,* 461 F.Supp.2d 1055, 1061 (E.D. Mo. 2006). Section 252(e)(1) states:

> Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

47 U.S.C. § 252(e)(1) (2009). AT&T Kentucky points to § 252(a)(1), which states, in part:

> Upon receiving a request for interconnection. . . pursuant to section 251 . . . an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier. . . . The agreement . . . shall be submitted to the State commission under subsection (e) of this section.

47 U.S.C. § 252(a)(1) (2009). AT&T Kentucky agrees that it must file and obtain the Commission's approval of interconnection agreements when, in accordance with § 252(a)(1), it negotiates with a requesting telecommunications carrier for interconnection. It asserts that the only other time it must file and obtain the Commission's approval of interconnection agreements

-11-

is when the arbitration procedures take place between a requesting telecommunication carrier and itself for interconnection pursuant to §§ 252(b) or (c).  AT&T Kentucky contends that these are the only two instances where it must file and obtain approval of interconnection agreements pursuant to 47 U.S.C. § 252(e)(1).

AT&T Kentucky further points to the FCC interpretation of these statutes in support of its position.  The FCC's interpretation of the 1996 Act is persuasive authority and will be given the appropriate deference.  *See Michigan Bell Telephone Co. v. Strand*, 305 F.3d 580, 586 (6th Cir. 2002).  The FCC determined that the agreements that contain an ongoing obligation relating to §§ 251(b) or (c) must be filed under § 252(a)(1) with the Commission.[5]  The FCC was careful to note that this standard does not include all agreements between an incumbent LEC and a requesting carrier.  *Id.*  The FCC went into more detail finding that an agreement that creates an ongoing obligation pertaining to resale, number portability, dialing parity, access to rights-of-way, reciprocal compensation, interconnection, unbundled network elements, or collocation is an interconnection agreement that must be filed pursuant to section 252(a)(1).  *Id.*

Specifically, the FCC determined that agreements addressing dispute resolution and escalation provisions relating to the obligations set forth in sections 251(b) and (c) are interconnection agreements.  *Id.* at ¶ 9.  Settlement agreements that contain an ongoing obligation are interconnection agreements that must be filed, but settlement agreements that only

---

[5] *In the Matter of Qwest Communications International Inc. Petition for Declaratory Ruling on the Scope of the Duty to File and Obtain Prior Approval of Negotiated Contractual Arrangements under Section 252(a)(1), Memorandum Opinion and Order*, 17 F.C.C.R. 19337, ¶ 8 & n.26, WC Docket No. 02-89, FCC 02-276 (Oct. 4, 2002) [hereafter, *FCC Opinion regarding 252(a)(1)*].

-12-

provide for "backward-looking consideration" (*e.g.*, the settlement of a dispute in consideration for a cash payment or the cancellation of an unpaid bill) do not need to be filed.  *Id*. at ¶ 12.  A form completed by carriers to obtain service pursuant to terms and conditions set forth in an interconnection agreement does not constitute an amendment to that interconnection agreement or a new interconnection agreement that must be filed under section 252(a)(1).  *Id.* at ¶ 13.  Additionally, agreements with bankrupt competitors that are entered into at the direction of a bankruptcy court or trustee and do not otherwise change the terms and conditions of the underlying interconnection agreement are not interconnection agreements or amendments to interconnection agreements that must be filed.  *Id.* at ¶ 14.  However, the FCC also determined that state commissions are well positioned to decide on a case-by-case basis whether a particular agreement is required to be filed as an "interconnection agreement."  *Id*. at ¶ 10.  In fact, the FCC specifically stated that it declined to establish an "interconnection agreement" standard.  *Id*.

The Commission argues that requiring the filing of provisions containing § 271 obligations is not circumventing this Court's ruling that it has no authority to act pursuant to § 271.  *See BellSouth Telecomm., Inc. v. Kentucky Pub. Serv. Comm'n*, 613 F. Supp. 2d 903 (E.D. Ky. 2009); *See BellSouth Telecomm., Inc. v. Kentucky Pub. Serv. Comm'n*, No. 06-65-KKC, 2007 WL 2736544, at *6 (E.D. Ky. Sept. 18, 2007).  Instead, the Commission asserts, it is merely trying to comply with 47 U.S.C. § 252(h), which requires that it have the approved interconnection agreements available for public inspection.  In its brief, the Commission states that interconnection agreements that relate to an ongoing obligation relating to §§ 251(b) or (c), including § 271 obligations, must be filed with the Commission.  However, this is not what the

-13-

Commission determined in the *PSC Order*. In the *PSC Order*, the Commission determined that *all* agreements containing a provision regarding obligations pursuant to 47 U.S.C. § 271 are interconnection agreements that must be filed with the Commission pursuant to 47 U.S.C. § 252(e)(1).

The Tenth Circuit addressed this specific issue, and the Commission agrees with its interpretation. *Qwest Corp. v. Public Utilities Com'n of Colorado*, 479 F.3d 1184 (10th Cir. 2007). In *Quest Corp.*, the Tenth Circuit affirmed the FCC's determination that all agreements that contain an ongoing obligation relating to §§ 251(b) or (c) must be filed with the Commission. *Id.; See FCC Opinion regarding 252(a)(1)*. The Tenth Circuit broadly interpreted the FCC standard to include all agreements reached following a request for "the physical linking of two networks,"(definition of "interconnection") and all agreements reached following a request for "facilities or equipment used in the provision of telecommunications service" (definition of "network elements"). *Id*. at 1195-6 (citation omitted). Specifically, the Tenth Circuit determined that an agreement that related to mass market switching and shared transport was an agreement for "network elements" and must be filed with the Commission. *Id*. at 1198-99. The fact that the mass market switching and shared transport were not unbundled network elements pursuant to § 251(c)(3) and were provided under § 271 had no bearing on whether the agreement was considered an "interconnection agreement." *Id*.

AT&T Kentucky argues that the Tenth Circuit misinterpreted the FCC's order as to what constitutes "an ongoing obligation relating to §§ 251(b) or (c)." [Record No. 43, p. 26] It asserts that the proper reading is that agreements are subject to filing when they relate to the actual

-14-

elements that are obligated by §§ 251(b) or (c).  *Id*.  AT&T Kentucky also notes that the Tenth Circuit's holding conflicts with the FCC's opinion because the Tenth Circuit's ruling subjects a broad range of agreements to the filing requirement, *Qwest Corp.*, 479 F.3d at n.11, but the FCC expressly stated that not all agreements between an incumbent LEC and a requesting carrier must be filed, *FCC Opinion regarding 252(a)(1)* at ¶ 8 & n.26.

SouthEast and CompSouth support the Commission's broad interpretation pointing to the language in § 271.  They claim that § 271 states that interconnection requirements must be provided by "one or more binding agreements that have been approved under section 252 of this title specifying the terms and conditions under which the Bell operating company is providing access and interconnection to its network facilities."  47 U.S.C. § 271(c)(1)(A).  SouthEast and CompSouth argue that § 271 agreements contain "interconnection requirements," are "interconnection agreements," and they must, therefore, be approved by the Commission under § 252.  SouthEast and CompSouth further contend that § 252(e)(1) plainly requires the filing of "any interconnection agreement adopted by negotiation or arbitration" and does not indicate that there are any "interconnection agreements" exempt from this requirement.

According to the *PSC Order*, the issue is whether "the Commission [has the] authority to require AT&T Kentucky to include in its interconnection agreements any network elements other than those required to be provided pursuant to 47 U.S.C. § 251".  *PSC Order* at 5.  The Commission answered this question by referring to § 271 and its obligations.  *Id*.  Instead of simply answering the question posed to the Commission, it appears to attempt to circumvent the repeated determination of this Court that the Commission has no authority to act pursuant to §

-15-

271. *BellSouth Telecomm., Inc. v. Kentucky Pub. Serv. Comm'n*, 613 F. Supp. 2d 903 (E.D. Ky. 2009); *BellSouth Telecomm., Inc. v. Kentucky Pub. Serv. Comm'n*, No. 06-65-KKC, 2007 WL 2736544, at *6 (E.D. Ky. Sept. 18, 2007). Whether AT&T Kentucky has satisfied the requirements of § 271 is the FCC's concern, not the Commission's. *This Court once again repeats to the Commission that it has no authority to act pursuant to § 271.* Section 271 should not have been mentioned in answering a question regarding the filing requirement of interconnection agreements because § 271 has no bearing on this requirement. *See id.*

The simple answer to the issue is yes. This Court adopts the standard set forth by the FCC that an agreement that creates an ongoing obligation pertaining to resale, number portability, dialing parity, access to rights-of-way, reciprocal compensation, interconnection, unbundled network elements, or collocation is an interconnection agreement that must be filed pursuant to section 252(a)(1). *FCC Opinion regarding 252(a)(1).* This filing obligation is not limited to only those agreements or provisions that involve the network elements required to be provided pursuant to 47 U.S.C. § 251. This obligation pertains to all agreements that contain an ongoing obligation relating to §§ 251(b) or (c). While the filing obligation will inevitably encompass some agreements regarding network elements provided under § 271, such as mass market switching and shared transport, § 271 has no bearing on whether an agreement is considered an "interconnection agreement."

## C.     Obligation To Commingle Network Elements

AT&T Kentucky also challenges the Commission's decision regarding its obligation to commingle network elements. It asserts that the Commission incorrectly determined that it must

-16-

commingle the facilities that must be provided under § 251 with the facilities that are chosen to

be provided under § 271.  Under § 271, if AT&T Kentucky wants to offer long-distance service,

it must provide competitive LECs with access to certain network elements even though those

network elements are no longer required to be provided to the competitive LECs under § 251.

*See Southwestern Bell Telephone, L.P. v. Missouri Public Service Comm'n*, 461 F. Supp. 2d

1055, 1061 (E.D. Mo. 2006).  Commingling means the:

> connecting, attaching, or otherwise linking of an unbundled network element, or
> a combination of unbundled network elements, to one or more facilities or
> services that a requesting telecommunications carrier has obtained at wholesale
> from an incumbent LEC, or the combining of an unbundled network element, or
> a combination of unbundled network element, with one or more such facilities or
> services.

47 C.F.R. § 51.5 (2009).

> For support, AT&T Kentucky points to an FCC decision[6] that states:

> We decline to require [AT&T Kentucky and other similar carriers], pursuant to
> section 271, to combine network elements that no longer are required to be
> unbundled under section 251. Unlike section 251(c)(3), items 4-6 and 10 of
> section 271's competitive checklist contain no mention of "combining" and, as
> noted above, do not refer back to the combination requirement set forth in section
> 251(c)(3).

*Triennial Review Order* at ¶ 655, n.1990.  AT&T Kentucky asserts that since there is not a

substantive difference between "combining" and "commingling," the FCC determination means

that it does not have a requirement to commingle § 251 and § 271 facilities.

---

[6] *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local
Exchange Carriers, Report and Order and Order on Remand and Further Notice of Proposed
Rulemaking*, 18 F.C.C.R. 16978, ¶ 655, n.1990, CC Docket Nos. 01-338, 96-98, 98-147 (September
17, 2003), *vacated in part and remanded in part by United States Telecom Ass'n v. FCC*, 359 F.3d
554, 589-90 (D.C. Cir. 2004), *cert. denied*, 543 U.S. 925 (2004). [hereafter, *Triennial Review
Order*].

AT&T Kentucky further argues that the FCC eliminated AT&T Kentucky's unbundling obligations for various network elements to promote innovating and investing in new facilities. *Triennial Review Remand Order*.  It asserts that the Commission's decision requiring commingling essentially negates the *Triennial Review Remand Order* by forcing AT&T Kentucky to furnish network elements in *combinations* that the FCC determined it was no longer required to furnish to competitive LECs.

The United States Court of Appeals for the District of Columbia affirmed this FCC determination that § 271 does not include a duty to combine network elements with § 251. *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 589 (D.C. Cir. 2004).  The United States District Court for the Eastern District of Missouri also agreed with this argument. *Southwestern Bell Telephone*, 461 F. Supp. 2d at 1069.  The Missouri court found that it was incorrect to require a company similar to AT&T Kentucky to combine switching, which is only required under § 271, with facilities required under § 251.  *Id.*  The Northern District of Illinois also held that requiring a company similar to AT&T Kentucky to provide certain combinations of network elements was preempted by the 1996 Act.  *Illinois Bell Telephone Co. v. O'Connell-Diaz*, No. 05 C 1149, 2006 WL 2796488, *14 (N.D. Ill. Sept. 28, 2006).

AT&T Kentucky further maintains that the FCC explicitly decided to remove § 271 facilities from the commingling requirement.  *See Triennial Review Order*.  The *Triennial Review Order* originally stated that the commingling obligation would extend to "network elements unbundled pursuant to section 271."  *Id.* at ¶ 584.  The FCC issued an Errata

-18-

specifically removing this phrase.[7]  AT&T Kentucky argues that this action demonstrates that the FCC specifically intended for § 271 facilities not to be subject to the commingling requirement.  The Commission asserts that this deletion is not dispositive because this portion of the *Triennial Review Order* addresses incumbent LECs resale obligation only.   The Commission claims that network element unbundling was irrelevant to this portion of the *Triennial Review Order* and that was the reason it was eliminated.  It also points out that the *Errata* deleted a portion to support its argument that § 271 elements are subject to the commingling requirement.[8]

AT&T Kentucky point to the FCC's statement in the *Quest* case for support.  The FCC explained that Quest, a company similar to AT&T Kentucky, had "introduc[ed] a commercial product designed to replace [the UNE Platform] – and to keep customers on its network – *even*

---

[7]   *See* Errata, *Review of the Section 251 Unbundling Obligation of Incumbent Local Exchange Carriers*, 18 F.C.C.R. 19020, ¶ 27, CC Docket Nos. 01-338, 96-98, 98-147 (September 17, 2003) (changed ¶ 584 as follows, "As a final matter, we require that incumbent LECs permit commingling of UNEs and UNE combinations with other wholesale facilities and services, including ~~any network elements unbundled pursuant to section 271 and~~ any services offered for resale pursuant to section 251(c)(4) of the Act.") [hereafter, *Errata*]

[8]   *Errata* at ¶ 31 deleted the last sentence of footnote 1990: "We decline to require BOCs, pursuant to section 271, to combine network elements that no longer are required to be unbundled under section 251. Unlike section 251(c)(3), items 4-6 and 10 of section 271's competitive checklist contain no mention of "combining" and, as noted above, do not refer back to the combination requirement set forth in section 251(c)(3). ~~We also decline to apply our commingling rule, set forth in Part VII.A. above, to services that must be offered pursuant to these checklist items.~~"  Footnote 1990 accompanied ¶ 655, which states, in part, "As explained above, recognizing an independent obligation on BOCs under section 271 would by no means be inconsistent with the structure of the statute. Section 271 was written for the very purpose of establishing specific conditions of entry into the long distance that are unique to the BOCs. As such, BOC obligations under section 271 are not necessarily relieved based on any determination we make under the section 251 unbundling analysis.[FN1990]

-19-

*in the absence of a legal mandate to do so*."[9]  AT&T Kentucky reasons that this statement would not make sense if the FCC rules already impose a legal mandate to combine facilities that must be made available under § 251 (such as loops) with those that must be provided under § 271 (such as switching) to create the same set of facilities that comprise the UNE Platform.  *See id*. The Commission rationalizes that AT&T Kentucky's reliance on *Quest* is flawed because the FCC was addressing Quest's request to be exempt from certain § 251 obligation in the Omaha market.  *Id*.  Quest was offering, according to the Commission, § 251 elements on a bundled basis despite no legal mandate to do so, not offering a combination of § 251 and § 271 network elements.  *Id*.

The Commission contends that it lawfully found that AT&T Kentucky must provide § 271 loops, transport, and switching "commingled" with § 251 network elements.   The Commission points to 47 C.F.R. § 51.309(e) and (f), which state:

> (e) Except as provided in § 51.318, an incumbent LEC shall permit a requesting telecommunications carrier to commingle an unbundled network element or a combination of unbundled network elements with wholesale services obtained from an incumbent LEC.

> (f) Upon request, an incumbent LEC shall perform the functions necessary to commingle an unbundled network element or a combination of unbundled network elements with one or more facilities or services that a requesting telecommunications carrier has obtained at wholesale from an incumbent LEC.

47 C.F.R. §§ 51.309(e), (f) (2009).  The Commission maintains that § 271 elements are wholesale services.  It asserts that local switching, local transport, and local loops are necessary

---

[9] *In the Matter of Petition of Qwest Corporation for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Omaha Metropolitan Statistical Area, Memorandum Opinion and Order*, 20 F.C.C.R. 19415, ¶ 82, WC Docket No. 04-223 (December 2, 2005) (emphasis added) [hereafter, *Quest*].

to link unbundled network elements (§ 251 elements) with wholesale services (§ 271 elements). The Commission does not claim that all § 271 elements must be provided pursuant to these statutes.  Instead, the Commission is reasoning that these regulations require AT&T Kentucky to provide local switching between the unbundled network elements (§ 251 elements) and the § 271 elements that it chooses to provide (wholesale services).

In *Quest*, the Commission contends that the FCC repeatedly used the term "Section 271(c) wholesale obligations."  *Quest*.  In addition, the Commission asserts that the Eleventh Circuit determined that these § 271 elements are wholesale services based on all the same arguments the Commission is making to this Court.  *See Nuvox Communications, Inc. v. BellSouth Communications, Inc.*, 530 F.3d 1330 (11th Cir. 2008).  The Commission maintains that because these § 271 elements are wholesale services, AT&T Kentucky must "perform the functions necessary to commingle" § 271 elements with § 251 network elements.  *See* 47 C.F.R. § 51.309(f) (2009).  The Commission further asserts that allowing AT&T Kentucky to not commingle these § 271 elements with § 251 network elements is the equivalent to cutting apart pieces of the network just so the competitor can't use them, which is sabotage. [Record No. 54, p.47]

The *PSC Order* states that competitive LECs seek to link UNEs or combinations of UNEs with local switching.  The crux of AT&T Kentucky's argument is that § 271 local switching, local transport, and local loops are a "delisted" network element and requiring these elements to be provided essentially negates the *Triennial Review Remand Order*.  The Commission

-21-

counters that the *Triennial Review Remand Order* would not be negated and that restricting commingling would undermine the goal of the 1996 Act to promote competition.

The Code of Federal Regulations does not provide a definition of "wholesale." Black's Law Dictionary defines "wholesale" as "[t]he sale of goods or commodities [usually] to a retailer for resale, and not to the ultimate consumer." Black's Law Dictionary (9th ed. 2009). Using this definition, any network element provided by AT&T Kentucky to a competitive LEC is a "wholesale service." After all, the competitive LEC's business is to sell the network elements obtained from AT&T Kentucky to the ultimate consumer. However, even using this expansive definition of wholesale services, AT&T Kentucky is still not required to provide local switching to competitive LECs under 47 C.F.R. § 51.309. According to 47 C.F.R. § 51.309(e), AT&T Kentucky must permit competitive LECs to connect, attach, or otherwise link § 251 elements with the § 271 elements that AT&T Kentucky chooses to sell to the competitive LEC. *See* 47 C.F.R. §§ 51.309(e), 51.5. This statute does not place any affirmative obligations on AT&T Kentucky. It simply requires AT&T Kentucky to allow a competitive LEC to install their own network element connecting, attaching, or otherwise linking the network elements purchased from AT&T Kentucky. *Id*.

Next, this Court must determine AT&T Kentucky's obligations under 47 C.F.R. §§ 51.309(f), which states that AT&T Kentucky must "perform the functions necessary" to connect, attach, or otherwise link § 251 elements with wholesale services. *See* 47 C.F.R. §§ 51.309(f), 51.5. Ultimately at issue is whether "perform the functions necessary" means AT&T Kentucky must provide § 271 loops, transport, and switching to competitive LECs despite the fact that

these network elements have been "delisted."  The answer is no.  AT&T Kentucky is not obligated to sell § 271 loops, transport, and switching.  AT&T Kentucky may chose to sell § 271 loops, transport, and switching and competitive LEC may chose to purchase such network elements.  However, AT&T Kentucky must, upon request, perform the functions necessary for a competitive LEC to connect, attach, or otherwise link § 251 elements with wholesale services.  This means, for example, that if a competitive LEC builds its own local switching and AT&T Kentucky must perform an action necessary for the local switching to work, AT&T Kentucky is obligated to perform this action.  Another example would be if a competitive LEC installed a local loop physically connecting a subscriber's premise to the competitive LEC's central office and if a computer code is necessary for the subscriber to obtain service, AT&T Kentucky would be obligated to input the necessary computer code.

### D.    Splitter

The Commission found that AT&T Kentucky must provide the splitter functionality upon request of a competitive LEC.  AT&T Kentucky also challenges this decision.  The term "line splitting" is used to describe the scenario where one competitive LEC provides narrowband voice service (*e.g.*, basic phone service) over the low frequency of a loop and a second competitive LEC provides xDSL service (*e.g.*, internet service) over the high frequency portion of that same loop.  *Triennial Review Order* ¶ 251.  The Seventh Circuit determined that a line splitter is not a network element; it enhances rather than enables a telecommunications service.  *Illinois Bell Telephone Co., Inc. v. Box*, 548 F.3d 607, 611 (7th Cir. 2008).

Here, both parties agree that AT&T Kentucky must establish the necessary processes in its operational support systems (OSS) to facilitate a competitive LEC's ability to engage in line-splitting arrangements. It is also undisputed that AT&T Kentucky must permit competing carriers to engage in line splitting where a competing carrier purchases the whole loop and provides its own splitter to be collocated in the central office. *Id*. However, at issue is whether AT&T Kentucky must provide the line splitter equipment to the competitive LECs upon request.

AT&T Kentucky points to a 2000 FCC opinion in support of its position.[10] This opinion states, in part:

> 327. We reject AT&T's argument that [the competitive LEC] has a present obligation to furnish the splitter when AT&T engages in line splitting over the UNE-P. The Commission has never exercised its legislative rulemaking authority under section 251(d)(2) to require incumbent LECs to provide access to the splitter, and ***incumbent LECs therefore have no current obligation to make the splitter available.***[FN910] As we stated in the UNE Remand Order, "with the exception of Digital Subscriber Line Access Multiplexers (DSLAMs), the loop includes attached electronics, including multiplexing equipment used to derive the loop transmission capacity."[FN911] We separately determined that the DSLAM is a component of the packet switching unbundled network element.[FN912] We observed that "DSLAM equipment sometimes includes a splitter" and that, "[i]f not, a separate splitter device separates voice and data traffic."[FN913] We did not identify any circumstances in which the splitter would be treated as part of the loop, as distinguished from being part of the packet switching element. That distinction is critical, because we declined to exercise our rulemaking authority under section 251(d)(2) to require incumbent LECs to provide access to the packet switching element, and our decision on that point is not disputed in this proceeding.

---

[10] *In the Matter of Application by SBC Communications, Inc., Southwestern Bell Telephone Company, and Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services In Texas, Memorandum Opinion and Order*, 15 F.C.C.R. 18354, ¶ 327, CC Docket No. 00-65 (June 30, 2000) [hereafter, *Texas 271 Order*].

-24-

*Texas 271 Order* ¶ 327 (emphasis added).  In 2003, the FCC affirmed this finding, stating, "The Commission previously found that existing rules require incumbent LECs to permit competing carriers to engage in line splitting where a competing carrier purchases the whole loop and *provides its own splitter* to be collocated in the central office." *Triennial Review Order* ¶ 251 (emphasis added).

AT&T Kentucky also relies upon 47 C.F.R. §§ 51.319(a)(1)(ii), (v) in support of its position.  These regulations provide that:

> (ii)  Line splitting.  An incumbent LEC shall provide a requesting telecommunications carrier that obtains an unbundled copper loop from the incumbent LEC with the ability to engage in line splitting arrangements with another competitive LEC using a splitter collocated at the central office where the loop terminates into a distribution frame or its equivalent.  Line splitting is the process in which one competitive LEC provides narrowband voice service over the low frequency portion of a copper loop and a second competitive LEC provides digital subscriber line service over the high frequency portion of that same loop.
>
> *****
>
> (v)  Control of the loop and splitter functionality.  In situations where a requesting telecommunications carrier is obtaining access to the high frequency portion of a copper loop either through a line sharing or line splitting arrangement, the incumbent LEC may maintain control over the loop and splitter equipment and functions, and shall provide to the requesting telecommunications carrier loop and splitter functionality that is compatible with any transmission technology that the requesting telecommunications carrier seeks to deploy using the high frequency portion of the loop, as defined in paragraph (a)(1)(i) of this section, provided that such transmission technology is presumed to be deployable pursuant to § 51.230.

47 C.F.R. §§ 51.319(a)(1)(ii), (v) (2009).

AT&T Kentucky argues that 47 C.F.R. § 51.319(ii) only requires incumbent LECs to grant competitors the ability to engage in line splitting arrangements with other competitive LECs using a splitter collocated at the central office.  *See* 47 C.F.R. § 51.319(ii).  AT&T

-25-

Kentucky interprets 47 C.F.R. § 51.319(v) to mean that the incumbent LEC "may" maintain control over the splitter if the incumbent LEC provides the splitter functionality. *See* 47 C.F.R. § 51.319(v). AT&T Kentucky further maintains that it would make no sense for the FCC to refer to splitters "collocated at the central office". Collocation, by definition, refers only to equipment that is owned by competitors and then placed (or "collocated") in a special area within the incumbent's central office. *See* 47 U.S.C. § 251(c)(6) (requirement that incumbents allow collocation by competitors); *GTE Service Corp. v. F.C.C.*, 205 F.3d 416 (D.C. Cir. 2000) (noted that "collocation" relates to "competitors' equipment").

The Commission argues that 47 C.F.R. § 51.319(v) must be read in conjunction with § 251 and 47 C.F.R. § 51.307. It contends that, when these statutes are read in conjunction, they establish the specific interconnection duties for an incumbent LEC. "An incumbent LEC shall provide a requesting telecommunications carrier access to . . . all of the unbundled network element's features, functions, and capabilities . . ." 47 C.F.R. § 51.307(c). Without providing any citations for support, the Commission asserts that line splitting is a function of the network.

The First Circuit determined that the 1996 Act does not say that a state commission cannot require the unbundling of non-network elements, nor does it say that about unbundling network elements, but to allow a state commission to require it would defeat the 1996 Act's goals. *Verizon New England, Inc. v. Maine Public Utilities Comm'n*, 509 F.3d 1, 9 (1st Cir. 2007). The Seventh Circuit determined that competitive LECs do not need splitting to provide network service, and therefore they must obtain it at market rates rather than at cost. *Illinois Bell Telephone Co., Inc. v. Box*, 548 F.3d 607, 619 (7th Cir. 2008).

This Court finds that the FCC has clearly stated that an incumbent LEC must grant competitors the ability to engage in line splitting arrangements with another competitive LEC using a splitter collocated, or stored, at the incumbent LEC's central office. The FCC has further stated that an incumbent LEC has no obligation to provide the splitter to the competitive LEC. If the incumbent LEC chooses to provide a splitter to a competitive LEC, the incumbent LEC may maintain control over its splitter. Thus, AT&T Kentucky, as an incumbent LEC, is not obligated to provide the splitter functionality to a competitive LEC.

### E.    Fiber Loops

The Commission was asked to determine the rules regarding the availability of unbundled access to loops where fiber facilities are the first and only telecommunications facilities to be deployed by the incumbent LEC. *PSC Order* at 50. The newly constructed areas where telecommunications services had not been previously deployed are known as "Greenfields." The Commission found that "AT&T Kentucky is obligated to unbundle DS1/DS3 loops consistent with 47 C.F.R. § 51.319(a)(4) and (5), regardless of the loop medium employed." *PSC Order* at 53. AT&T Kentucky asserts that it is not required to unbundle fiber loops or hybrid fiber-copper loops regardless of the type of customer served by the loop. According to AT&T Kentucky, the FCC determined that an incumbent LEC does not have to provide access to new fiber facilities to its competitors in order to encourage facilities-based investment. *Triennial Review Order* at ¶ 200. Specifically, the FCC found:

> we find that different policy considerations, as well as different technical considerations, are associated with copper loops, hybrid copper/fiber loops, and fiber-to-the-home ("FTTH") loops. For example, we decline to require incumbent LECs to provide unbundled access to their hybrid loops for the provision of

broadband services.[FN627]  Similarly, we decline to unbundle loops that consist of FTTH facilities for broadband services.  As explained more fully below, this unbundling approach - i.e., greater unbundling for legacy copper facilities and more limited unbundling for next-generation network facilities - appropriately balances our goals of promoting facilities-based investment and innovation against our goal of stimulating competition in the market for local telecommunications services.

*Id.*

However, AT&T Kentucky fails to cite the footnote within the above paragraph, which

states:

FN627.  Incumbent LECs must continue to provide unbundled access to the [Time Division Multiplexing] features, functions, and capabilities of their hybrid loops.  This will allow competitive LECs to continue providing both traditional narrowband services (*e.g.*, voice, fax, dial-up Internet access) and high-capacity services like DS1 and DS3 circuits.

*Id.* at n.627.  As the footnote explains, the FCC only declined to require incumbent LECs to

provide access to hybrid loops for broadband services but required incumbent LECs to provide

access to the features, functions, and capabilities of their hybrid loops.

AT&T Kentucky second argument relies on 47 C.F.R. § 51.319(a)(3), which states in

relevant part:

(i) Definitions.

(A) Fiber-to-the-home loops. A fiber-to-the-home loop is a local loop consisting entirely of fiber optic cable, whether dark or lit, serving an end user's customer premises or, in the case of predominantly residential multiple dwelling units (MDUs), a fiber optic cable, whether dark or lit, that extends to the multiunit premises' minimum point of entry (MPOE).

(B) Fiber-to-the-curb loops. A fiber-to-the-curb loop is a local loop consisting of fiber optic cable connecting to a copper distribution plant that is not more than 500 feet from the customer's premises or, in the case of predominantly residential MDUs, not more than 500 feet from the

-28-

> MDU's MPOE. The fiber optic cable in a fiber-to-the-curb loop must connect to a copper distribution plant at a serving area interface from which every other copper distribution subloop also is not more than 500 feet from the respective customer's premises.

> (ii) New builds. An incumbent LEC is not required to provide nondiscriminatory access to a fiber-to-the-home loop or a fiber-to-the-curb loop on an unbundled basis when the incumbent LEC deploys such a loop to an end user's customer premises that previously has not been served by any loop facility.

47 C.F.R. § 51.319(a)(3) (2009).  AT&T Kentucky interprets this regulation to mean that it is not required to unbundle fiber optic loops in 'Greenfields.'  AT&T Kentucky further contends that the FCC's decision to change the term "residential unit" to "end user's customer premises" in 47 C.F.R. § 51.319(a)(3)(i) and (ii) demonstrates that this rule was meant to apply to both residential and mass market customers.[11]

The Commission counters with a different section of the same regulation:

> (4) DS1 loops.

> (i) Subject to the cap described in paragraph (a)(4)(ii) of this section, an *incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to a DS1 loop* on an unbundled basis to any building not served by a wire center with at least 60,000 business lines and at least four fiber-based collocators.  Once a wire center exceeds both of these thresholds, no future DS1 loop unbundling will be required in that wire center.  A DS1 loop is a digital local loop having a total digital signal speed of 1.544 megabytes per second. DS1 loops include, but are not limited to, two-wire and four-wire copper loops capable of providing high-bit rate digital subscriber line services, including T1 services.

---

[11]  *See Errata* at ¶ 38; *see also* Errata, *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket Nos. 01-338, 96-98, 98-147, 2004 FCC LEXIS 6241, ¶ 11 (Oct. 29, 2004) ("On the first page of Appendix B listing the final rules, in rule section 51.319(a)(3)(ii), titled 'New builds', we replace the words 'a residential unit' with the words 'an end user's customer premises.'").

-29-

       (ii) Cap on unbundled DS1 loop circuits. A requesting telecommunications carrier may obtain a maximum of ten unbundled DS1 loops to any single building in which DS1 loops are available as unbundled loops.

* * *

   (5) DS3 loops.

       (i) Subject to the cap described in paragraph (a)(5)(ii) of this section, an *incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to a DS3 loop* on an unbundled basis to any building not served by a wire center with at least 38,000 business lines and at least four fiber-based collocators.  Once a wire center exceeds both of these thresholds, no future DS3 loop unbundling will be required in that wire center.  A DS3 loop is a digital local loop having a total digital signal speed of 44.736 megabytes per second.

       (ii) Cap on unbundled DS3 loop circuits. A requesting telecommunications carrier may obtain a maximum of a single unbundled DS3 loop to any single building in which DS3 loops are available as unbundled loops.

47 C.F.R. §§ 51.319(a)(4), (5) (2009) (emphasis added).  In accordance with these regulations, the Commission contends that AT&T Kentucky must unbundle DS1 loops and DS3 loops for mass market customers that have the required number of business lines regardless of the loop medium.

       The Commission further argues that an incumbent LEC has a competitive advantage not only in routing calls within the exchange but, through its control of this local market, in the markets for terminal equipment and long-distance calling.  *Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467, 490 (2002).  A newer or smaller company could not compete with an incumbent LEC to provide local service without coming close to replicating the incumbent's entire existing network, the most costly and difficult part of which would be laying down the local loop to the thousands (or millions) of terminal points in individual houses and businesses.

-30-

*Id.* Due to the high cost to lay down the local loop and the 1996 Act's goal to encourage competition, the Commission asserts that AT&T Kentucky cannot and should not have the advantage of excluding competitive LECs to compete within Greenfields.

The FCC determined that "because the record does not demonstrate that carriers can economically self-provision at the DS1 level, we do not delegate to the states the authority to consider DS1 loop impairment on a location-specific basis based on a self-provisioning trigger." *Triennial Review Order* at ¶ 327. The Commission interprets this to mean that the FCC determined that impairment already exists regarding DS1 enterprise loops and the states need not do the analysis. [Record No. 47, p. 36] The Commission further asserts that the FCC has delegated to the states to resolve issues on DS3 enterprise loop impairment. *Triennial Review Order* at ¶ 321 (the FCC delegates to the states the authority to collect and analyze more specific evidence of DS3 loop deployment on a customer location-specific basis, applying uniform national triggers that measure self-provisioning or wholesale alternative availability to determine customer locations where competitive carriers are not impaired without access to incumbent LEC unbundled DS3s).

There appears to be a conflict in the statutes when a DS1 loop, made entirely out of fiber optic cable, is deployed to an end user's customer premises that previously has not been served by any loop facility where the wire center to which it is connected serves less than 60,000 business lines and less than four fiber-based collocators. The same conflict appears to exist when a DS3, made entirely out of fiber optic cable, is deployed to an end user's customer premises that previously has not been served by any loop facility where the wire center to which

it is connected serves less than 38,000 business lines and less than four fiber-based collocators. The FCC eliminated unbundling with respect to dark fiber loops on a nationwide basis. *Triennial Review Remand Order* at ¶ 166.

The over-arching goal of the 1996 Act is to promote competition and encourage the rapid deployment of new telecommunications technologies *See* 1996 Act. The Commission asserts that, due to the high cost to deploy local loops using fiber optic cable, it is not economically feasible for a competitive LECs to compete within a Greenfield enterprise area because a competitive carrier would be forced to build its own identical network. However, the Court finds this assertion to be incorrect. The cost would be the same to an incumbent LEC and a competitive LEC to deploy a DS1/DS3 loop using fiber optic cable to an end user's customer premise that previously has not been served by any loop facility. The recovery cost would also be the same. When connecting a new customer to the telecommunication network, the 1996 Act encourages the deployment of new technologies. It would not appear that AT&T Kentucky would spend substantial sums deploying DS1/DS3 loops using fiber optic cable if it would then be required to provide nondiscriminatory access to its competitors.

In summary, an incumbent LEC is still obligated to unbundle DS1/DS3 loops consistent with 47 C.F.R. § 51.319(a)(4) and (5), regardless of the loop medium employed. However, if the DS1/DS3 loop is made of fiber optic cable and the end user's customer premise has not previously been served by any loop facility, AT&T Kentucky is not obligated to unbundle. An incumbent LEC is not required to provide access to hybrid loops for broadband services but is required to provide access to the features, functions, and capabilities of their hybrid loops.

# III.

The Commission's authority based on Kentucky statutory law to regulate the terms and rates of those network elements which were "delisted" by the FCC is preempted. All agreements that create an ongoing obligation pertaining to resale, number portability, dialing parity, access to rights-of-way, reciprocal compensation, interconnection, unbundled network elements, or collocation is an interconnection agreement that must be filed pursuant to section 252(a)(1). While the filing obligation will inevitably encompass some agreements regarding network elements provided under § 271, such as mass market switching and shared transport, § 271 has no bearing on whether an agreement is considered an "interconnection agreement."

AT&T Kentucky must allow a competitive LEC to install their own network element connecting, attaching, or otherwise linking the network elements purchased from AT&T Kentucky. And while AT&T Kentucky is not obligated to sell § 271 loops, transport, and switching, it must, upon request, perform the functions necessary for a competitive LEC to connect, attach, or otherwise link § 251 elements with wholesale services.

AT&T Kentucky must grant competitors the ability to engage in line splitting arrangements with another competitive LEC using a splitter collocated, or stored, at the incumbent LEC's central office. However, AT&T Kentucky has no obligation to provide a splitter to a competitive LEC. If AT&T Kentucky chooses to provide a splitter to a competitive LEC, AT&T Kentucky may maintain control over its splitter.

AT&T Kentucky is obligated to unbundle DS1/DS3 loops consistent with 47 C.F.R. § 51.319(a)(4) and (5), regardless of the loop medium employed. However, if the DS1/DS3 loop

is made of fiber optic cable and the end user's customer premise has not previously been served by any loop facility, AT&T Kentucky is not obligated to unbundle.  AT&T Kentucky is not required to provide access to hybrid loops for broadband services but is required to provide access to the features, functions, and capabilities of their hybrid loops.

Accordingly, it is hereby **ORDERED** as follows

1.      AT&T Kentucky's request for declaratory and injunctive relievl is **GRANTED**, in part, and **DENIED**, in part, in accordance with this opinion.

2.      The Kentucky Public Service Commission's Orders, Case No. 2004-00427, dated December 12, 2007, and January 18, 2008, are declared unlawful and preempted by federal law, in part, in accordance with this opinion.

3.      All Defendants and other parties acting in concert therewith are **ENJOINED** from seeking to enforce the unlawful decisions against AT&T Kentucky in accordance with this opinion.

4.      This case is **REMANDED** to the Kentucky Public Service Commission to vacate the relevant aspects of their opinion and for further proceedings consistent with this opinion.

5.      This matter is stricken from the active docket of this Court.

This 22nd day of February, 2010.



Signed By:

_Danny C. Reeves_

United States District Judge